## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARK ROSENBLUM | : | FIRST AMENDED COMPLAINT |
| vs. | : | NO. 13-CV-2219 |
| THOMSON REUTERS (MARKETS), LLC | : | JURY TRIAL DEMANDED |

Plaintiff, Mark Rosenblum, by his attorneys, Young Law Group, P.C. upon information and belief, complains as follows:

### NATURE OF THE CASE

1.      Plaintiff brings this action charging that the Defendant Thomson Reuters violated Section 21F of the Securities & Exchange Act of 1934 as amended by The Dodd Frank Act, 15 U.S.C. §78u-6, et seq. ("The Dodd Frank Act") or (DFA), seeking to recover double the lost wage damages for psychological and emotional stress related to his firing and pending unemployment, damages to reputation,  reasonable attorney's fees, punitive damages, and costs, as a result of being retaliated against, harassed, and ultimately terminated as a result of his actions in a "protected activity" as defined by 15 U.S.C. 78u-6, et seq.  by the Dodd Frank Act.

### JURISDICTION AND VENUE

2.      Jurisdiction of this Court is proper under 15 U.S.C. §78u-6(h)(1)(B)(i) and 28 U.S.C.§§1331.

3.      Venue is proper in this district pursuant to 15 U.S.C.§78aa(a) and 28 U.S.C. § 1391(b)(1) and (2) based upon Defendant's location within the County of New York and State of New York,

within the Southern District of New York, which is also the site of Defendant's retaliatory acts against the plaintiff.

## PARTIES

4.     Plaintiff Mark Rosenblum (hereinafter "Rosenblum") is a resident of the State of New Jersey.

5.     At all relevant times, Defendant Thomson Reuters (Markets) LLC (hereinafter "Thomson"), headquartered at 3 Times Square, New York, NY 10036, was a foreign business entity duly existing pursuant to, and by virtue of, the laws of the State of Delaware, and authorized to do business in the State of New York.

6.     At all relevant times Rosenblum was an employee of Thomson.

## MATERIAL FACTS

7.     At all times material hereto Thomson was a publicly traded company at the New York Stock Exchange (Ticker; TRI) under Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. §78l and required to file reports under §15d of the Act, 15 U.S.C. 78o(d); 18 U.S.C. 1514A(a).

8.     At all times material hereto, Rosenblum was employed by Thomson as a "Redistribution Specialist" selling millions of dollars in financial data to Thomson customers for the purpose of making investment decisions.

9.     Rosenblum worked at Thomson from 1998 to 2000 and then again from July of 2005 until August 3, 2012 when he was fired in retaliation for his reporting Securities violation internally and to law enforcement.

10.     In the early part of 2012, Rosenblum was employed as a Redistribution Specialist and

was often times brought in by the sales team to assist them in closing redistribution contracts.

11.    Rosenblum was assigned to work mostly as a redistribution specialists of Thomson's financial products to firms that are not directly involved in managing money i.e., YAHOO Finance, MSN.com, CNBC, Fox Business.

12.    Rosenblum's bonus system was a two-tiered quarterly system.  The top half is based upon meeting revenue quotas with the maximum amount of $25,0000 and the "bottom half" which was subjectively determined by Thomson supervisor, Ron Ramjug, with a maximum of $12,500 (for a total of $37,500) which is determined by Ron Ramjug's subjective evaluation of Rosenblum's added value in partner engagement and execution, communication and meetings.

13.    For the past five quarters Rosenblum was awarded all of his sales incentives based upon the objective goals set for the top half.

14.    In 2011 and 2012 up to his retaliatory firing, Rosenblum maxed out his top half quarterly bonuses based on objective goals.

|  | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| **Top 2011** | $12,500 out of $12,500 | $25,000 out of $25,000 | $25,000 out of $25,000 | $25,000 out of $25,000 |
| **Bottom 2011** | $11,750 out of $12,500 | $6,250 out of $12,500 | $8,824.88 out of $12,500 | $6,400 out of $12,500 |
| **Top 2012** | $25,000 out of $25,000 | | | |
| **Bottom 2012** | $11,250 out of $12,500 | | | |

15.    To track bonuses and sales figures Thomson utilized a software system known as TRUST (Thomson Unified Sales Tool) which includes sales vetting forms.

16.    In addition to his sales responsibilities Rosenblum was also expected to aid and assist the sales team on issues such as user band pricing and negotiations of terms and conditions during the sales process.

17.    As early as January 2012 Rosenblum became aware of Thomson's product known as the Thomson University of Michigan Survey of Consumers ("the Product").

18.    This Product gauges consumers' attitudes and expectations about the U.S. economy and the public's attitude about future changes of economic expectation.

19.    According to Thomson's website, the Product's Index of Consumer Expectations is an official component of the U.S. Index of Leading Economic Indicators and "will gauge how consumers feel the economic environment will change."

20.    The U.S. Index of Leading Economic Indicator is used by the Federal Reserve in establishing monetary policy.

21.    In May of 2012 Rosenblum was asked by Ron Ramjug to get involved in redistribution of the Product to firms prior to its public release at 10:00 a.m. on the second and fourth Friday of the month.

22.    However, CNBC and several other news outlets were publishing the numbers at 9:55 a.m. making the redistribution sale of the product between 9:55 a.m. and 10:00 a.m. impossible.

23.    Thomson sent out cease and desist letters to several news outlets but the public disclosure of the product at 9:55 a.m. is still being announced.

24.    By agreement between Thomson and the University of Michigan, the Product is compiled

by The University of Michigan, and is released in three tiers.  The contract between Thomson and the University of Michigan states in part:

> It is the understanding of the parties that the Data shall be released each month as follows:
>
> 1.  Thomson will send out the Data to Subscribers of its ultra-low latency distribution platform for purposes of algorithmic trading at approximately 9:54:58.00 (plus/minus 500 milliseconds).
>
> 2.  Supplier shall release the certain Data (the "Headline Numbers") described in Exhibit __ attached hereto, via a telephonic conference call in which Subscriber may participate on or after 9:55:00.  For the avoidance of doubt, the conference call may commence at any time prior to 9:55:00, except that the monthly Headline Numbers shall not be disclosed on the conference call until 9:55:00 or later.
>
> 3.  Thomson shall have the right to release the Data to its general Subscribers other than the subscribers in 1 above (i.e. generally its terminal base subscribers) on or after 9:55:00.
>
> 4.  The Data shall be released to subscribing re-distributers, the general pubilc and the website for Supplier and Thomson respectively at 10:00:00.

25.    Robert Khuzani, the SEC's enforcement director stated in September of 2012 in connection with the New York Stock Exchange early release of market data: "[i]mproper early access to market data, even measured in milliseconds, can in today's markets be a real and substantial advantage that disproportionately disadvantages retail and long-term investors."

26.    After being asked to redistribute the product to non-financial users between 9:55 a.m. and 10:00 a.m. Rosenblum became aware of the three-tiered release.

27.    The tiered release provides a bimonthly release of information to "ultra low-latency" subscribers at 2 seconds before 9:55 a.m. followed by "desktop" subscribers at 9:55 a.m., followed by release to the public at 10:00 a.m.

28.    On or about May 10, 2012, Richard Turner, Thomson employee, e-mailed Thomson's

employees stating that the Product provided "potentially market-moving information" to the
"ultra-low latency" subscribers who received the Product at two seconds before 9:55 a.m.

29.     In May of 2012, the Product's author from the University of Michigan, Richard Curtain,
came to New York and spoke to Thomson's employees about the Product.

30.     Thereafter, in discussion, Mr. V. Balakrishna it was revealed that certain Thomson
customers were actually receiving the Product results as early as 9:06 a.m.

31.     By releasing the Product to ultra low-latency subscribers two seconds early, those
subscribers have a two second head start to make transactions based upon that information.

32.     At or about this time, Rosenblum formed a reasonable belief that the Product's tiered
release violated SEC laws, barring insider trading including but not limited to §10b Security
Violations.

33.     In the world of ultra high frequency trading a two second advance notice allows hundreds
of millions of dollars of securities and futures to be traded.

34.     By as early as May 1st, upon learning of the May 14th Richard Curtin presentation,
Rosenblum attempted to bring up the ethics and lawfulness of the three tiered release as follows:

     a)     On or about May 1, 2012, Rosenblum spoke with Mitch Reissman, Business
          Manager,  about the 9:54:58 release and told him that this was a Securities
          violation;

     b)     On or about May of 2012 during a breakfast meeting with Marika Vilen, Global
          Head of Strategies, and Mitch Reissman, Business Manager,  Mark  Rosenblum
          discussed his concerns about the 9:54:58 a.m. release;

     c)     On May 9, 2012, Rosenblum attempted to discuss the ethics of the second release

with his boss, Ron Ramjug, V.P. of Partnerships, indicated he was unaware of this tiered release;

d)     On May 14, 2012, during the Richard Curtin presentation to the Thomson sales force, Rosenblum asked Richard Curtin whether this was an FD (Fair Disclosure) violation, and was told it didn't apply as it was a private business venture and not governmental;

e)     On May 15, 2012, Rosenblum again raised this issue with Ron Ramjug and Rosenblum asked to raise this issue with Nick Webb, Managing Director, at the Wednesday partnership meeting.  Rosenblum also told Ron Ramjug that Curtin's answer did not make sense;

f)     On Wednesday, May 16, 2012, at the partnership meeting, Rosenblum again brought up the early release and Marika Vilen told him that was a Thomson desktop salesforce issue, not his issue;

g)     On May 21, 2012, Rosenblum approached Nick Webb about his concerns and that Rosenblum was told to approach Rich Brown, Global Head of News Analytics;

h)     On May 23, 2012 Rosenblum approached Marika Vilen who told him that our concerns are not about the two second head-start, but about limiting other providers from getting the numbers so Thomson could profit from redistribution after 9:55 a.m.;

i)     On or about June 22, 2012Rosenblum raised his concerns to Ron Ramjug and was told to stop trying to figure out what Thomson is doing wrong, and close more business;

    j)        On June 25, 2012 Craig Lippman, who was with the partner group and a friend of Nick Webb said "you are not doing yourself any favors by chasing down who is getting the numbers ahead of time -this will affect Nick's profits, and your bonus";

    k)        On June 28, 2012,  Webb called Rosenblum into his office and told him that "Craig Lippman tells me your sticking your nose where it does not belong", and strongly advised Rosenblum to stop being a hero;

    l)        On the morning of June 29, 2012 Rosenblum called the FBI about the early release of the Product before 9:54:58 a.m.;

    m)      Later that day, when the early complaints were not being acted upon, Rosenblum sent an email to Thomson's Ethics Committee;

    n)      On June 29, 2012  Rosenblum alerted Thomson that he had gone to the FBI;

    o)      Between June 29.2012 and August 3 ,2012  Rosenblum had several telephone conversations and meetings with the FBI and Rosenblum's supervisors at Thomson were aware of his reporting of Securities violations to the FBI.

35.    At all times material hereto, Rosenblum had a reasonable belief (both objective and subjective) that his early disclosure of the Product was a violation of the SEC rules and regulations.

36.    On June 29, 2012 Rosenblum notified Ron Ramjug, Manager,  the  General Counsel Priscilla Hughes, and President of Sales, Chris Perry, and the Thomson employee Ethics Hotline that he had contacted federal investigators regarding the Product's tiered release.

37.    Upon information and belief, this early release violates the Regulation NMS which

regulates how companies, such as Thomson, share information with the public and is meant to ensure equal access to that information. The early release of this number provided an advantage to those companies which could result in inequity in the marketplace in violation of the Regulation NMS.

38.     Upon further information and belief this early release violates Section 10b-5 of the SEC Act of 1934, which makes it unlawful to mislead investors or omit facts which could mislead investors.

39.     The reports constituted a protected act under the Dodd Frank Act.

40.     On or about August 3, 2012, mere weeks after the reports, Rosenblum's employment with Thomson was terminated with no severance and without compensating Plaintiff for any of his accrued vacation days.

41.     Prior to the Report, Rosenblum's job performance was exceptional, and he routinely received bonuses totaling more than $100,000.00 per year. Rosenblum executed all of his job tasks in exceptional fashion, and without complaint.

42.     Thomson embarked on a discriminatory crusade to terminate Rosenblum on the sole basis of the reports, which was a protected activity.

43.     Thomson has raised as a pretext to the firing of Rosenblum, his improper attempts at gaining commissions on sales contracts that he was not entitled.

44.     Thomson knew that Rosenblum was not a commissioned employee, and nearly always met or nearly met his bonus and that his name added in the Software program "Trust" would not affect his bonus nor was it an attempt to obtain fees on sales contracts he did not earn.

45.     As early as December 31, 2011, Rosenblum was praised by Chris Perry, President of

Sales.  See Exhibit 2.

46.     On May 23, 2012 Rosenblum brought to Ron Ramjug's attention that his name was being added to opportunities in "TRUST" that Rosenblum should not have been added in an effort to straighten out this problem.  See Exhibit 3.

47.     As of this point Ron Ramjug was not concerned with any issues that Rosenblum may have had with the "TRUST" sales software.

48.     Additionally, on June 13th, Rosenblum emailed Ron Ramjug that the vetting forms were causing problems in Rosenblum's computer.  See Exhibit 4(a)(b) and (c).

49.     These two issues later became the central theme and pretext for Thomson retaliatory firing of Rosenblum.

## COUNT I

## AS A FIRST CAUSE OF ACTION PURSUANT TO THE

## DODD FRANK ACT 15 U.S.C.§78U-6(h)(i)(A)

50.     Plaintiff incorporates by reference as though fully incorporated herein at length, the allegations of Paragraphs 1 through 49 above.

51.     Plaintiff made several internal complaints to Thomson to his superiors and the Ethics Committee as well as to the Federal Bureau of Investigation.

52.     Thomson, through its agents, Marika Vilen, Ron Ramjug, Chris Perry, Craig Lippman, Nick Webb, Anu Neiminen, Tim Baker, Maria Diaz, Priscilla Hughes, Ramitha Nair, and members of the Thomson's Ethics Committee entered into a scheme to retaliate against Rosenblum for his reporting of the early release of the Product.

53.     The employers knew that the early release of the Product when sold would create

enormous profits for Thomson as well as the sales team and sales executives.

54.   15 U.S.C.§78u-6(h)(1)(A) states in relevant part that an employer may not "discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment."

55.   At all times material hereto, Rosenblum was a whistleblower within the definition of 15 U.S.C. 78u.

56.   Rosenblum's disclosures internally and to the F.B.I. about the tiered and early release of market moving data was a "protected activity" under 15 U.S. §784-6(h)(i)(A) iii) which states:

> (iii)   in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 *et seq*.), the Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq*), including section 10A(m) of such Act (15 U.S.C. 78f(m)), section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

57.   On August 12, 2011, the SEC - to whom Congress delegated authority to administer the whistleblower provisions of Dodd Frank, see 15 U.s.C. §78u-6(I) - promulgated a final rule regarding the relationship between Section 78u-6(h)(1)(A), the anti-retaliation provision, and Section 78u-6(a)(6), the provision defining "whistleblower." The SEC's rule provides:

> (b)   Prohibition against retaliation:
>
> (i)   You possess a reasonable belief that the information you are providing relates to a possible securities law violation (or, where applicable, to a possible violation of the provisions set forth in 18 U.S.C. 1514A(a)) that has occurred, is ongoing, or is about to occur, and;
>
> (ii)   You provide that information in a manner described in Section 21F(h)(1)(A) of the Exchange Act (15 U.S.C. 78u-6(h)(1)(A)).
>
> (iii)   the anti-retaliation protections apply whether or not you satisfy the requirements, procedures and conditions to qualify for an award.

58.     Plaintiff, at all times material hereto, possessed a reasonable belief that Defendant was committing a securities law violation.

59.     Defendant has retaliated against plaintiff due to his protected avtivities, and as such, Defendant has violated the Dodd Frank Act, as stated.

60.     Defendant is in violation of 18 U.S.C. 1513(e) which states:

> (e)     Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

## INJURY AND DAMAGES

61.     As a result of the acts and conduct complained of herein, Rosenblum has suffered, and will continue to suffer, the loss of a career, and the loss of twice his salary, bonuses, benefits, and other compensation which employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, physical pain and suffering, inconvenience, injury to his reputation, loss of enjoyment of life, and other non-pecuniary losses.  Plaintiff has further experienced severe emotional and physical distress.

## JURY DEMAND

62.     Plaintiff demands a trial by jury.

WHEREFORE, Plaintiff respectfully requests judgment against Thomson:

a)     Declaring that the Defendant engaged in unlawful employment practices prohibited by The Dodd Frank Act by terminating plaintiff for engaging in a protected activity.

-12-

b)    Awarding damages to the Plaintiff, from the date of termination, to make him whole for any losses suffered as a result of such unlawful employment practices;

c)    Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering, and injury to his reputation in an amount to be proven.

d)    Awarding Plaintiff punitive damages.

e)    Awarding Plaintiff's attorney's fees, costs, and expenses incurred in the prosecution of the action.

f)    Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy the Defendant's unlawful employment practices.

YOUNG LAW GROUP, P.C.

*James J. McEldrew, III /s/*

BY_____
        JAMES J. McELDREW, III (of counsel)
        Attorney for Plaintiff
        123 South Broad Street, Suite 1920
        Philadelphia, PA 19109
        (215) 545-8800
        jim@mceldrewlaw.com

## **VERIFICATION**

1.      I am the plaintiff in this action;

2.      I verify that the statements made in the foregoing Amended Complaint are true and correct to the best of my knowledge, information, and belief; and

3.      I understand that the statements made herein are subject to the penalties relating to unsworn falsification to authorities.

Date 8/6/2013

MARK ROSENBLUM

| From: | Rosenblum, Mark (Financial&Risk) |
|---|---|
| Sent: | Friday, June 29, 2012 1:37 PM |
| To: | Nair, Ramitha (Financial&Risk) |
| Subject: | FW: ThomsonReuters/University of Michigan Surveys of Consumers - June 2012 Finals - Headline |
| Attachments: | FF201206.pdf; Headlines201206.xls; 158OBV3CD1NF.xls |
| Importance: | High |
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

**From:** Rosenblum, Mark (Financial&Risk)
**Sent:** Friday, June 29, 2012 12:51 PM
**To:** Ethics
**Cc:** Perry, Christopher J. (Financial&Risk); Ramjug, Ronald J. (Financial&Risk); Hughes, Priscilla C. (Financial&Risk)
**Subject:** FW: ThomsonReuters/University of Michigan Surveys of Consumers - June 2012 Finals - Headline
**Importance:** High

To Ethics:

I would like to report that I believe the firms on the attached spreadsheet are receiving the ThomsonReuters/University of Michigan Surveys of Consumers in advance of the time they are legally suppose to receive it.

I have alerted the FBI Agents I work closely with, who I have spoken with in the past when they were investigating SAC Capital. I have also alerted my legal representation as I fear retribution similar to what I went through the last time I cooperated with the FBI,DOJ,SEC, 60 Minutes and the N.Y. Times.

Regards,
Mark
W 646-223-4261
C 917-549-2765
H 908-340-4131

**From:** Balakrishna, Varadhan Y. (Financial&Risk)
**Sent:** Friday, June 29, 2012 9:06 AM
**To:** Nieminen, Anu (Financial&Risk); Jackson, Ericka (Financial&Risk); Reisman, Mitchell (Financial&Risk); Cardillo, David (Financial&Risk); Panzer, Bryant (Financial&Risk); Rosenblum, Mark (Financial&Risk); Vernekar, Preeti N (Financial&Risk)
**Cc:** TR Datafeeds Admin; Balakrishna, Varadhan Y. (Financial&Risk)
**Subject:** ThomsonReuters/University of Michigan Surveys of Consumers - June 2012 Finals - Headline
**Importance:** High

Hello All,

The headline number for today's call is **73.2**



Regards,

Varadhan Balakrishna
Team Leader(GAP Operations Group)

Thomson Reuters

Phone: +91-80-40651885

varadhan.yedikere@thomsonreuters.com
thomsonreuters.com

Disclaimer: - This message is for the designated recipient only and may contain privileged, proprietary, or otherwise private information. If you have received it in error, please notify the sender immediately and delete the original. Any other use of the email by you is prohibited.

2

# surveys of consumers
**THOMSON REUTERS / UNIVERSITY OF MICHIGAN**

*Monitoring trends for over 60 years*



Subject: June 2012 survey results.                                                                June 29, 2012
From:   Richard Curtin, Director

Confidence slipped a bit more in late June, although most of the decline was recorded by mid month. Most of the loss for the month as a whole was in prospects for the national economy. Perhaps of greater importance, the entire June decline was among households with incomes above $75,000 (down 15.7 Index points from May), while among lower income households the Sentiment Index was virtually unchanged (off just 0.1 Index points). Higher income households reported sharply lower expectations for the economy as well as for their own financial situation. Recent declines in gas prices benefitted lower income households to a greater degree, offsetting their more negative concerns about economic prospects. While the overall level of consumer sentiment is substantially above last summers's low, which would normally indicate a growth slowdown not a downturn, the buying plans of upper income households have also sharply declined. Since these households account for a large share of total spending, if the declines continue in the months ahead, it could have a substantial impact on total spending. All of the June data was collected prior to the Supreme Court decision on the health care legislation; whatever impact that decision might have is yet to be observed. The June decline among high income households was associated with a large drop in favorable ratings of economic policies, and a growing recognition that federal policies to bridge the fiscal cliff will not be discussed until the last minute. This favors the adoption of more cautious spending plans to protect their interests.

Fewer consumers reported gains in their finances, mostly due to less favorable income trends. Most of the losses were reported by households with incomes above $75,000: the proportion that reported worsened finances rose by 11 percentage points, and reports of income declines rose by 17 percentage points. The proportion of high income households that expected improved finances during the year ahead fell to 24% in June from 37% in May. Inflation-adjusted income losses were anticipated by 54% of high income households. Lower income households were hardly more favorable on that count. Indeed, just 9% of households regardless of their income level expected gains in their inflation-adjusted incomes in the year ahead.

Consumers expected a year-ahead inflation rate of 3.1% in June, just between the 3.0% recorded in May and the 3.2% in April, but well below the 3.8% of a year ago. Long term inflation expectations also increased marginally to an annual rate of 2.8% in June, just between the 2.7% in May and 2.9% in April. Importantly, long term inflation expectations are still below the 12 month peak of 3.0%, recorded three months and one year ago, showing no evidence of a break in its flat trend.

News about recent economic developments heard by consumers have become increasingly negative. Reports of job losses, for the first time since last December, outnumbered reports of job gains. When specifically asked about prospects for the national unemployment rate, consumers were more likely to expect increases rather than declines for the first time since the start of the year. Consumers were more likely to report that overall economic conditions had recently weakened, and were less likely to expect them to improve during the year ahead. Confidence in government economic policies fell in June but was still above the abysmal level recorded last August during the debt ceiling debate. Just 10% of all consumers rated current economic policies favorably in June, just above last year's low of 5%; negative ratings were given by 42% of all consumers.

Buying plans for durables and vehicles were virtually unchanged among lower income households but were much less favorable among households with incomes above $75,000. Favorable views toward buying conditions for household durables fell by 14 percentage points among higher income households compared with a loss of just 2 percentage points among lower income households. Vehicle buying attitudes declined by 8 percentage points among upper income households but were unchanged among households with incomes below $75,000. Very favorable home buying conditions are still the polar opposite of very unfavorable home selling conditions, but home prices were more frequently expected to increase than to decline during the year ahead. While the price advantage was still quite slim, it was the first hopeful price sign since 2008.

| | June 2011 | July 2011 | Aug 2011 | Sept 2011 | Oct 2011 | Nov 2011 | Dec 2011 | Jan 2012 | Feb 2012 | March 2012 | April 2012 | May 2012 | June 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Index of Consumer Sentiment | 71.5 | 63.7 | 55.8 | 59.5 | 60.8 | 63.7 | 69.9 | 75.0 | 75.3 | 76.2 | 76.4 | 79.3 | 73.2 |
| Current Economic Conditions | 82.0 | 75.7 | 68.5 | 75.2 | 74.9 | 77.4 | 79.6 | 84.2 | 83.0 | 86.0 | 82.9 | 87.2 | 81.5 |
| Index of Consumer Expectations | 64.7 | 55.9 | 47.6 | 49.4 | 51.7 | 54.9 | 63.6 | 69.1 | 70.3 | 69.8 | 72.3 | 74.3 | 67.8 |
| Index Components | | | | | | | | | | | | | |
| Personal Finances—Current | 84 | 77 | 68 | 77 | 77 | 79 | 77 | 88 | 87 | 97 | 88 | 93 | 85 |
| Personal Finances—Expected | 108 | 103 | 99 | 104 | 102 | 106 | 108 | 112 | 109 | 112 | 110 | 113 | 110 |
| Economic Outlook—12 Months | 74 | 55 | 40 | 39 | 45 | 52 | 70 | 82 | 82 | 79 | 87 | 91 | 79 |
| Economic Outlook—5 Years | 77 | 64 | 48 | 52 | 58 | 60 | 75 | 82 | 90 | 89 | 92 | 94 | 81 |
| Buying Conditions—Durables | 128 | 117 | 108 | 117 | 115 | 120 | 128 | 130 | 128 | 125 | 126 | 132 | 125 |

© The University of Michigan, 2012. All rights reserved.

Reuters/University of Michigan                                    Surveys of Consumers

## HEADLINES

| Month and Year YYYYMM | Index of Consumer Sentiment ICS | Index of Current Conditions ICC | Index of Consumer Expectations ICE | One Year Price Expectations PX1 Median | 5-10 Year Price Expectations PX5 Median |
|---|---|---|---|---|---|
| 201106 | 71.5 | 82.0 | 64.7 | 3.8 | 3.0 |
| 201107 | 63.7 | 75.7 | 55.9 | 3.4 | 2.9 |
| 201108 | 55.8 | 68.5 | 47.6 | 3.5 | 2.9 |
| 201109 | 59.5 | 75.2 | 49.4 | 3.3 | 2.8 |
| 201110 | 60.8 | 74.9 | 51.7 | 3.2 | 2.7 |
| 201111 | 63.7 | 77.4 | 54.9 | 3.2 | 2.7 |
| 201112 | 69.9 | 79.6 | 63.6 | 3.1 | 2.7 |
| 201201 | 75.0 | 84.2 | 69.1 | 3.3 | 2.7 |
| 201202 | 75.3 | 83.0 | 70.3 | 3.3 | 2.9 |
| 201203 | 76.2 | 86.0 | 69.8 | 3.9 | 3.0 |
| 201204 | 76.4 | 82.9 | 72.3 | 3.2 | 2.9 |
| 201205 | 79.3 | 87.2 | 74.3 | 3.0 | 2.7 |
| 201206 | 73.2 | 81.5 | 67.8 | 3.1 | 2.8 |

## BT Conferencing Inc.



**Company Name: Thomson Reuters**
**Chair: Varadhan Balakrishna**

Date: Friday, June 15, 2012
Time: 09:55 AM Eastern (New York)
Participant list for Confirmation #: 8OBV3CD1NF

Thank you for using BT Event Call. Please help us to continue to improve the service we provide to you, by taking 5 minutes to complete a brief survey based on the service you used by selecting the service below. We realize your time is valuable and we thank you in advance for your consideration and feedback.

| | Name: | Company: |
|---|---|---|
| 1 | REBECCA MCBEE | **SPEAKER** |
| 2 | COOPER HOWES | BARCLAYS |
| 3 | TIM MARTIN | BANK OF AMERICA |
| 4 | JONATHAN PINGLE | BREVAN HOWARD |
| 5 | BRIAN COLBERT | CHOPPER TRADING |
| 6 | JOHNATHON BASILE | CREDIT SUISSE |
| 7 | CARL RICCADONNA | DEUTSCHE BANK |
| 8 | LOU BRIEN | DRW TRADING |
| 9 | ANDREW TILTON | GOLDMAN SACHS |
| 10 | DAVE EVERHART | INTERNATIONAL TRADING GROUP |
| 11 | MATT SCHRECENGOST | JUMP TRADING |
| 12 | ARTHUR SUNG | MOORE CAPITAL |
| 13 | OMAIR SHARIF | RBS |
| 14 | CHIZU NOMIYAMA | REUTERS |
| 15 | LORI HELWING | SAC CAPITAL |
| 16 | NICOLAS DELMOTTE | SG AMERICA SECURITIES |
| 17 | BERABHAN BALAKRISHNA | THOMSON REUTERS |
| 18 | CHRISTIAN BROWN | TOWER TRADING GROUP |
| 19 | KEVIN CUMMINS | UBS |

25 Braintree Hill Park
Suite 200
Braintree, MA 02184
866.766.8777

From:            Perry, Christopher J. (M SlsSvc A)
Sent:            Saturday, December 31, 2011 12:33 AM
To:              Rosenblum, Mark (Financial&Risk)
Subject:         RE: Rosenblum 2011

Mark,

Not a great deal of visibility but I am aware of the function and some of the people, including you.  I will be taking a deeper look at Solutions and Specialist sales in 2012, but regardless of any review, I value you bringing in real business opportunities for the company.

Happy New Year,
Chris

---

**From:** Rosenblum, Mark (MSOLS)
**Sent:** Wednesday, December 21, 2011 1:34 PM
**To:** Perry, Christopher J. (M SlsSvc A)
**Cc:** Boyes, Stephen E. (MSOLS)
**Subject:** Rosenblum 2011

Chris,

I'm not sure how much visibility you have into the solutions partners and alliances team but wanted to take a moment and toot my own horn.  The information below is from TRUST and I had a $4M (360K MRR) plus year.  I don't own any opportunities in TRUST and as you can see, I worked with a lot of talented folks to help put up great numbers.  I look forward to 2012..

Stephen—I know we have never had an in-depth conversation but I work on redistribution deals and enjoy my role working with Ron Ramjug. Almost all of my time is spent working on new redistribution deals and selling more content/services/solutions to existing partners.

Happy Holidays,
Mark
646-223-4261

---

Team Member Name: Mark Rosenblum (42 records)

Close Month: 1/1/2011 (1 record)

| | | |
|---|---|---|
| linkedFA | John Kearns | LFA-TRKD API-3000 Redistribution |

Close Month: 2/1/2011 (1 record)

| | | |
|---|---|---|
| New Media Properties | Craig Lippmann | Re-distribution Reuters Fundamentals New Media |

Close Month: 3/1/2011 (1 record)

| | | |
|---|---|---|
| EOTPro Advanced Trading Technologies | Ester Demorest | EOTPRO-TRNA |

Close Month: 4/1/2011 (5 records)

1

EXHIBIT
2

| | | |
|---|---|---|
| CME Group Index Svcs LLC/CME | Derk Osenberg | CME - IBES and Worldscope via Factset |
| BLUELEAF SECURITY, INC. | Susette Frank | Blueleaf_Lipper_LDFS |
| Goldline International Inc. | Michael Barbara | Goldline International - Index feed |
| Omnitec Solutions, Inc. | US Direct Invst - Americas Invst | Omnitec Solutions, Inc. - RKD Renewal - 03/15/11 |
| RobotDough Software Corporation | Christopher Kleparek | RobotDough - RKD Fundamentals & Consensus Estimates(Global) - FTP |

**Close Month: 5/1/2011 (3 records)**

| | | |
|---|---|---|
| Acquire Media | MigratedAMER Accounts | Acquire Media- Online Reports, Sig Devs |
| GoodGuide | Anu Nieminen | US_GoodGuide_Redistribution_Asset4 |
| Aon Service Corporation | Alex Olsen | Hewitt - Lipper FDP |

**Close Month: 7/1/2011 (3 records)**

| | | |
|---|---|---|
| CME Group Inc | Kelly Petty | CME – Datastream |
| Lewtan Technologies | Glenn Strier | Lewtan Redist |
| Xignite Inc | Mark Rosenblum | Xignite - TDF WEB Global Level 1 |

**Close Month: 8/1/2011 (3 records)**

| | | |
|---|---|---|
| OANDA Corporation | Craig Lippmann | OANDA IFR Forex Increase |
| Microsoft/Msnbc | Dan Dosen | Online - MSN Insider Ownership |
| The Advisor Lab, LLC | Maryann O'mea | Lipper LDFS Advisor Lab |

**Close Month: 10/1/2011 (6 records)**

| | | |
|---|---|---|
| Revere Data, LLC | Craig Lippmann | US Lippmann 10/04/2011 15:51:16 |
| Wealth Access, LLC | MigratedAMER Accounts | Wealth Access-TRSPA |
| New Constructs lLc | Maryann O'mea | Lipper LDFS New Constructs |
| FEDERAL RESERVE BOARD OF GOVERNORS | Maryann O'mea | Lipper TASS Add'l Federal Reserve Board |
| Northfield Information Services, INC | Colin Longval | Northfield - DDL |
| Hsbc Corretora De Titulos E Valores Mobiliarios S. | Daniel Buttino | MetaStock Professional - HSBC |

**Close Month: 11/1/2011 (10 records)**

| | | |
|---|---|---|
| Standard & Poor's | Mitchell Reisman | US_S&P_Index_Calc_Usage_Q3 2011 |
| Insurance Technologies LLC | Alex Olsen | Insurance Tech_VA Cust Feed_1 |
| | Joseph Fischer | BNY Worldscope IBES redistribution Internal distribution |
| T Rowe Price Associates, Inc. | Jeff Bauman | T. Rowe Price_WSCP_redistribution |
| VUEFOLIO, INC | Carl Huber | Our Paisa - Lipper/Equity Data - 1 user |
| DONOFRIO INC | Melissa Bott | Turn Key Partners- Data Feed - 1 user |
| Fox News Channel | Earl Golden | Fox: Disater Recovery site |
| Forcastix LLC | Jason Hartman | Forcastix - Reuters US Fundamentals via FTP - 1 |

| | | |
|---|---|---|
| Sabrient Systems, LLC | Shamala Balasubramaniam | Sabrient Systems – Global Contract Expansion |
| Standard & Poor's | Mitchell Reisman | Standard & Poors_ESG data to Index Group for Index creation |

**Close Month: 12/1/2011 (9 records)**

| | | |
|---|---|---|
| BMO Asset Management Inc | Clayton Feick | BMO AssetMgmt: ETF quotes via TRKD API |
| Interactive Data | Jason Riegler | IDC_Lipper Data Hosting_1 |
| ADVISEN LTD. | Anu Nieminen | Adivsen_RKD_Renewal_Ownership_and_Filings |
| Tradelink | Terry Dyra | TradeLink-IDC via QA |
| VectorVest, Inc | Craig Lippmann | VectorVest-IBES Level 1 Uptick |
| Axioma, Inc | Glenn Strier | Axioma – Onsite Server |
| Newport Group | Maryann O'mea | Lipper Datafeed Benchmarks Newport |
| Standard & Poor's | Susan Eansor | S&P – DSS – fixed income for index |
| Streetwise Reports | Darren Hamilton | Streetwise: TRKD API – Charts & News |

| From: | Ramjug, Ronald J. (Financial&Risk) |
|---|---|
| Sent: | Wednesday, May 23, 2012 3:48 PM |
| To: | Rosenblum, Mark (Financial&Risk) |
| Subject: | RE: No delete Button |

Ok. Thanks Mark.

**From:** Rosenblum, Mark (Financial&Risk)
**Sent:** Wednesday, May 23, 2012 3:39 PM
**To:** Ramjug, Ronald J. (Financial&Risk)
**Subject:** FW: No delete Button

I have lost the capability of deleting my name off of opportunities therefore I cannot remove myself from the 3 opportunities you highlighted this morning.  I have worked with Heather & Eddie to resolve and no solution has been found.

**From:** Rosenblum, Mark (Financial&Risk)
**Sent:** Wednesday, May 23, 2012 3:36 PM
**To:** Jacobs, Eddie (Financial&Risk); Batten, Heather (Financial&Risk)
**Subject:** No delete Button



EXHIBIT
3

1

| From: | TR Datafeeds Admin |
|---|---|
| Sent: | Wednesday, June 13, 2012 10:06 AM |
| To: | Rosenblum, Mark (Financial&Risk) |
| Cc: | Jackson, Ericka (Financial&Risk); TR Datafeeds Admin; Balakrishna, Varadhan Y. (Financial&Risk) |
| Subject: | RE: Vetting Form |
| Attachments: | Vetting Form_October2011_Final (2) (5) - E (4) - 11-16-2011.xlsm |
| Importance: | High |

Hi Mark,

Please find attached herewith latest Vetting Form.

Regards

**Preeti Verneker**
GAP Operations Group

**Thomson Reuters**

☎ Tel:  +91-08-40652280
✉: preeti.verneker@thomsonreuters.com
thomsonreuters.com

**From:** Jackson, Ericka (Financial&Risk)
**Sent:** Wednesday, June 13, 2012 9:57 AM
**To:** TR Datafeeds Admin
**Subject:** FW: Vetting Form

Please send to Mark.

**From:** Rosenblum, Mark (Financial&Risk)
**Sent:** Wednesday, June 13, 2012 9:46 AM
**To:** Jackson, Ericka (Financial&Risk)
**Subject:** Vetting Form

Can I please get the latest version—the last one crash my machine-Thanks



1

| | |
|---|---|
| **From:** | Batten, Heather (Financial&Risk) |
| **Sent:** | Wednesday, May 23, 2012 1:36 PM |
| **To:** | Rosenblum, Mark (Financial&Risk) |
| **Subject:** | RE: TRUST |

Hi Mark – Yes, you cannot remove yourself from opportunities once they hit sales stage 6 & 7. The sales team is locked down at that point and you would have to raise an adj request in ICSA to have yourself removed for commissions purposes if needed.

Don't shoot the messenger ; )

Thanks,
Heather

---

**From:** Rosenblum, Mark (Financial&Risk)
**Sent:** Wednesday, May 23, 2012 12:17 PM
**To:** Batten, Heather (Financial&Risk)
**Subject:** TRUST
**Importance:** High

Heather

I can't seem to delete myself from Opportunities anymore—Has something changed?

Thanks,
Mark



1

| From: | Batten, Heather (Financial&Risk) |
|---|---|
| Sent: | Wednesday, May 23, 2012 4:16 PM |
| To: | Rosenblum, Mark (Financial&Risk); Jacobs, Eddie (Financial&Risk) |
| Cc: | Ramjug, Ronald J. (Financial&Risk) |
| Subject: | RE: Competitor is Null |

Hi Mark,
I've raised the issue with the 'TR Sales User' profile not having the ability to delete themselves from an oppty sales team to MIS. I will let you know when it has been resolved. It seems to be an issue with the profile and I apologize for any inconvenience caused.

Thank you,
Heather

**Heather Batten**
Americas Sales Process Specialist
Thomson Reuters
646 223 4604
201 927 1861

**Have an enhancement idea for TRUST? Submit it here: <u>TRUST Ideas</u>**
Have a question about TRUST or TRUST Processes? Ask it here: <u>TRUST Answers</u>

**From:** Rosenblum, Mark (Financial&Risk)
**Sent:** Wednesday, May 23, 2012 4:12 PM
**To:** Jacobs, Eddie (Financial&Risk); Batten, Heather (Financial&Risk)
**Cc:** Ramjug, Ronald J. (Financial&Risk)
**Subject:** FW: Competitor is Null

Eddie/Heather,

Thank you for working with me today to resolve the issue where I can't delete my name from opportunities. I know the issue has not been fixed yet.  Can you please kindly delete my name to the opportunity for the link below?

Mark


<u>https://na2.salesforce.com/0064000000MHXHQ?srPos=0&srKp=006</u>


**From:** Jacobs, Eddie (Financial&Risk)
**Sent:** Wednesday, May 23, 2012 3:31 PM
**To:** Cambria, Andrew (Financial&Risk); Lupmanis, Bob (Financial&Risk); Dosen, Dan D. (Financial&Risk); Buttino, Daniel (GGO); Reinmund, Dan P. (Financial&Risk); Julien, Eduardo (GGO); Strier, Glenn (Financial&Risk); Giachetto, Greg (Financial&Risk); Isaksen, Jan E. (Financial&Risk); Harmon, Jeff (Financial&Risk); Rosenblum, Mark (Financial&Risk); Ghaussy, Massud (Financial&Risk); Stanley, Patrick (Financial&Risk)
**Cc:** Webb, Nick (Financial&Risk)
**Subject:** Competitor is Null

1



EXHIBIT
4 (6)

Please update these today – thank you!

**Eddie Jacobs**
Solutions Business Operations – Americas Head

Thomson Reuters

Phone: 646-223-7270

edward.jacobs@thomsonreuters.com
thomsonreuters.com